**UNITED STATES of America**

v.

**Generoso CARNEVALE, Jr.**

**Cr. No. 85–0038–05–S.**

United States District Court,
D. Rhode Island.

Dec. 19, 1985.

## MEMORANDUM

SELYA, District Judge.

This case, in its present posture, brings into focus nagging problems concerning the administration and implementation of the Criminal Justice Act, 18 U.S.C. § 3006A (1985) (Act). Because of the increases in attorney compensation which will result from the Congress's recent efforts to update the applicable rates and otherwise to improve the structure of the law, *see* Criminal Justice Act Revision of 1984, Pub.L. No. 98–473, § 1901(1), 98 Stat. 2185–86 (1984) (codified at 18 U.S.C. § 3006A (1985)) it is more vital than ever before that such concerns be addressed. Thus, although matters such as this are most often handled with a minimum of formality, some detailed treatment of the subject would, in this court's view, prove useful.

### I.

A member of the bar of this court was appointed to defend Generoso Carnevale, Jr. on or about May 29, 1985. The designation was made pursuant to the Act, a magistrate having certified that the accused was "financially unable to obtain adequate representation." 18 U.S.C. § 3006A(a). Carnevale was one of six defendants charged with violations of 18 U.S.C. §§ 2,

371, 2312, 2313, and 2314 in a multiple-count indictment. Carnevale's defense was successful; following trial, he was acquitted on all charges. The jury verdicts were returned on October 24, 1985.

Defense counsel then petitioned the court on November 4, 1985 for an award of fees under 18 U.S.C. § 3006A(d).[1] She sought total compensation of $6700, well in excess of the standard maximum fee of $2000. *See id.* at § 3006A(d)(2). ("For representation of a defendant before the United States magistrate or the district court, or both, the compensation to be paid to an attorney ... shall not exceed $2,000 for each attorney in a case in which one or more felonies are charged.") The court, troubled by the casualness of Barrister's proffer, entered an order on November 13, 1985, requiring her to furnish further particularization and to review her application in light of certain questions raised sua sponte by the court. Barrister responded with a more detailed filing on November 22, 1985, but claimed the same fee entitlement. Given the statutory mosaic, her petition can be honored only if this court (i) finds that Carnevale's defense demanded "extended or complex representation," *id.* at § 3006A(d)(3), and (ii) "certifies that the amount of the excess payment is necessary to provide fair compensation." *Id.* Additionally, the chief judge of the circuit must acquiesce. *Id.* The pertinent portion of the text of § 3006A(d)(3) is set out in the margin.[2]

### II.

The court approaches the Barrister application with considerable circumspection. By and large, appointment of an attorney as counsel for an indigent defendant creates a relationship which lacks the full consensuality normally characteristic of the

---

**1.** In order to spare unnecessary embarrassment to the attorney involved, she will be referred to in this rescript by the pseudonym "Betty Barrister" (Barrister).

**2.** Section 3006A(d)(3) of the Act intones in material part:

Payment in excess of any maximum amount provided in [§ 3006A(d)(2) ] may be made for extended or complex representation when the court in which the representation was rendered ... certifies that the amount of the excess payment is necessary to provide fair compensation and the payment is approved by the chief judge of the circuit.

bond between lawyer and client. Thus, in one sense at least, attorneys are pressed into such service, and meet an important systemic need.[3] So, it can be argued that it comes with a certain ill grace for the court, on its own initiative, to bite the hand that feeds the system.

Yet, judges have a responsibility in such matters which cannot be shirked. *See* 18 U.S.C. § 3006A(d)(4) ("The court shall fix the compensation and reimbursement to be paid to the attorney...."); Plan, § 4 at 7 ("In fixing [compensation] the judge will bear in mind the qualification of attorneys and the relative difficulty encountered in presenting the case"). *Cf. Gabriele v. Southworth*, 712 F.2d 1505, 1507 (1st Cir. 1983) (fee applications under 42 U.S.C. § 1988 in prisoner civil rights cases "are subject not only to testing by adversaries but to the independent review of a court"). Judge Bazelon has tellingly articulated the congressional intent:

> It was clearly not intended that the trial judge or [the chief judge of the circuit] sit as clericals, doing nothing more than multiplying hours times the statutory rate to arrive at a fee award; nor that the statutory limitation be waived in every case in which compensation for counsel's services, if computed at maximum hourly rates, would exceed the statutory limits. The act ... calls for an informed judicial determination based upon the facts of the individual case.

*United States v. Thompson*, 361 F.Supp. 879, 883–84 (D.D.C.1973). *See also United States v. Tutino*, 419 F.Supp. 246, 249 (S.D. N.Y.1976) (same).

█ The Criminal Justice Act was originally passed into law in 1964. It has been significantly modified by several amendments enacted since that time, most recently by the Criminal Justice Act Revision of 1984. But, the fundamental purpose of the legislation remains unchanged. The law is designed to implement the guarantees of the sixth amendment to the Constitution by assuring to individuals accused of crime in a federal venue the availability of competent counsel to "furnish[ ] representation for any person financially unable to obtain adequate representation." 18 U.S.C. § 3006A(a). The focus of the Act is on "an adequate defense" for those who could not otherwise afford one. *Id.* Put another way, the "purpose of the Criminal Justice Act is to furnish counsel to indigent defendants who, presumably, need counsel." *United States v. O'Clair*, 451 F.2d 485, 486 (1st Cir.1971) (per curiam). And, the fact that the government has assumed fiscal responsibility for providing "sums necessary to carry out the provisions of [the Act]," 18 U.S.C. § 3006A(j), does not transform the statute into an annuity for the bar. *See Tutino*, 419 F.Supp. at 248. Thus, this court recognizes its responsibility to provide a judicial counterweight to ensure that the calipers of justice remain in a state of libration.

### III.

In attempting to balance the scales, the court acknowledges that the instructions of the Congress are indistinct. Insofar as the Act itself is concerned, "the governing criteria are hardly self-explanatory." *United States v. Bailey*, 581 F.2d 984, 986 (D.C. Cir.1978). Judge Bazelon opined in 1978 that "it can fairly be said that the ... Act leaves the prerequisites for excess compensation ... 'essentially standardless'" *Id.* at 987, *quoting* Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, The Criminal Justice Act in the Federal District Courts 179, 182 (Comm.Print 1969). The neoteric amend-

---

**3.** In this district, however, such service is more aleatory than involuntary. The "panel" from which assigned counsel are chosen, 18 U.S.C. § 3006A(b), comprises only lawyers who have expressed a generic willingness to accept such designations. Assignments in particular cases are, in most instances, made randomly by the luck of the draw from within the contours of the roster of volunteers. This district's formal "Plan for Adequate Representation pursuant to the Criminal Justice Act of 1964, as amended" (Plan), originally adopted on February 24, 1971, embodies those principles. *See* Plan, § 2 at 4–5. Betty Barrister was named to represent Carnevale in precisely this stochastic fashion.

ments enacted after 1978 have neither filled this void nor simplified the judicial task. So, evenhanded application of the statute continues to be "a frustrating process," *Thompson*, 361 F.Supp. at 884, but a process from which there is no principled escape.

The case law, though sparse, is of some assistance. Certain basic tenets have found widespread acceptance. The courts have recognized the appropriateness of considering C.J.A. fee applications in light of

> the amount, character and complexity of work required; responsibilities involved; manner in which duties were performed; knowledge, skill and judgment required of and used by counsel; professional standing of counsel as reflected by length of time at bar, experience acquired and reputation established; nature of counsel's practice and injury thereto; any extraordinary pressure of time or other factors under which services were rendered; results achieved; and any other circumstances brought to the Court's attention relevant and material to the determination of a fair and reasonable fee.

*United States v. James*, 301 F.Supp. 107, 116 (W.D.Tex.1969) (footnote omitted). *See also United States v. Johnson*, 549 F.Supp. 78, 82 (D.D.C.1982); *Tutino*, 419 F.Supp. at 249; *Thompson*, 361 F.Supp. at 884 & nn. 11–12; *United States v. Ursini*, 296 F.Supp. 1155, 1157–58 & n. 2 (D.Conn. 1968). *See generally* Judicial Conference of the United States, Guidelines for the Administration of the Criminal Justice Act ¶ 2.22B (as amended Sept. 22, 1978); Plan, § 4 at 7.

■ These criteria cannot, however, be applied in a vacuum. The expenditure of time and energy alone is not dispositive. "Common sense confines [the computation of the] value [of the services] to reasonably competent and productive effort, and excludes bumbling and wasteful activity from the count." *Bailey*, 581 F.2d at 987. As with the more familiar standards engrafted by the courts in the 42 U.S.C. § 1988 con-

text, *e.g., Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983); *Furtado v. Bishop*, 635 F.2d 915, 920 (1st Cir.1980); *King v. Greenblatt*, 560 F.2d 1024, 1026–27 (1st Cir.1977), *cert. denied*, 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978), only reasonably productive time is deserving of recompense.

There is a further distinction, however, which departs sharply from the § 1988 environment. The maximum rates promulgated in the Criminal Justice Act are just that: maxima. They are not routinely to be used to compensate all counsel—even all proficient counsel—in all cases. As this district's Plan states: "The hourly rates of compensation are designated and intended to be maximum rates and will be treated as such." Plan § 4 at 7. It must be remembered that the Act's purpose was not to benefit the bar, *see* text *ante* at Part II, but to assure to indigent defendants the availability of competent counsel. Historically, dedicated lawyers had volunteered their time *pro bono* to achieve this end. The Act sought to ease the burden on such advocates—not to eliminate it entirely.

> A substantial element of appointed counsel's representation under the Act remains public service and congress has made it clear that the fees allowable under the Act are not intended to provide full compensation to counsel.

*United States v. Hildebrandt*, 420 F.Supp. 476, 478 (S.D.N.Y.1975). *See also Bailey* 581 F.2d at 988; *Tutino*, 419 F.Supp. at 248; *Thompson*, 361 F.Supp. at 887; *United States v. Harper*, 311 F.Supp. 1072, 1074 (D.D.C.1970). Though the Act was aimed at sparing appointed counsel from rags and tatters, it was not designed to robe them in silks and satins.

The Criminal Justice Act Revision of 1984 is of a piece with these precepts. The legislative history reveals an intention to upgrade compensation not to market levels, but to a degree satisfactory "to ensure that those attorneys who accept appointments do not suffer economic hardship." H.Rep. No. 98–764, 98th Cong., 2d Sess. 1, *reprinted in* 1984 U.S.Code Cong. & Ad.News

3667, 3668 (hereinafter "House Report"). Indeed, the original version of the 1984 bill, H.R. 4307, contained projected rates and per-case maxima somewhat more generous than those eventually adopted. The inference is unmistakable: Congress believed that appointed counsel should continue to make some (reasonable) financial sacrifice in these matters. .

In providing for waiver of the maxima where warranted, 18 U.S.C. § 3006A(d)(3), it is noteworthy that the Congress spoke in terms of "fair compensation." "Fair" does not mean "full." And, fairness must be measured both by the goals of the Act and the circumstances of the case. Accordingly, the authorities are virtually consentient that, in respect to excess compensation applications, reliance on the maximum rates is the exception rather than the rule. *See, e.g., Hildebrandt,* 420 F.Supp. at 478; *United States v. Dodge,* 260 F.Supp. 929, 929 (S.D.N.Y.1966); *United States v. Hanrahan,* 260 F.Supp. 728, 729 (D.D.C.1966). "The Act's use of the words 'fair compensation' for this situation must be interpreted in light of the general limitations on payment found in the Act." *Id.* Indeed, the Plan says it all:

> [The maximum hourly rates] are not intended to change the basic and underlying philosophy of the Act that the bar of the nation owes a responsibility to represent persons financially unable to retain counsel, and that the compensation provided is not intended to equate private counsel fees. In keeping with that philosophy, when charges in excess of the statutory maximum are sought, it is to be only in the unusual case, and it is the intent that such further charges be at a lower hourly rate.

Plan § 4 at 7.

■ The court is cognizant that, over time, Congress has evinced some intention to liberalize the strictures of the Act. This has been made manifest not only by the periodic upgrading of hourly rates and ceilings, but by the deletion of the original requirements that the maxima could be sidestepped only for cases involving "protracted representation" in "extraordinary circumstances." *Compare* Pub.L. No. 88–455, 78 Stat. 552, 553 (1964), 18 U.S.C. § 3006A(d) (1970) *with* 18 U.S.C. § 3006A(d)(3) (1976).[4] Yet these changes have merely eased, not abolished, the constraints on fee awards. *See Bailey,* 581 F.2d at 988. Though this court eschews so miserly a construction of the Act as would dampen the bar's enthusiasm to participate in the defense of indigents accused of crime (a result which would, in large part, defeat the wholesome promise of the legislation), it will not rubberstamp excess-compensation applications. Such incursions on the public fisc merit careful scrutiny. And, use of the maxima as a basis for calculating fee claims in such instances will be sanctioned only where the problems in the case, or the quantity or calibre of the services, or the idiocratic difficulties inherent in the defense, are significantly outside the scope of routine expectations. Even in such cases, recompense will be allowed only for reasonably productive time. Fairness, after all, is a two-way street.

### IV.

■ The court now turns to Barrister's application and to a consideration of her eligibility for excess compensation. In so doing, the court reminds counsel that the burden rests with the applicant to "provide sufficient details to support the premises that the representation was indeed extended or complex and that the excess is essential to fairness of the remuneration." *Bailey,* 581 F.2d at 990 (footnote omitted). *See also Thompson,* 361 F.Supp. at 884; *United States v. Naples,* 266 F.Supp. 608,

---

**4.** It would serve no useful purpose for this court to attempt to trace the statutory lineage. That heritage has already been well documented. *E.g., Bailey,* 581 F.2d at 986–87 & nn. 7–18; *Johnson,* 549 F.Supp. at 79 & nn. 7–12; *Tutino,* 419 F.Supp. at 248–49 & nn. 3–8; House Report at 2–4, 1984 U.S.Code Cong. & Ad.News at 3669–71. (The 1982 amendments, Pub.L. 97–164, were of a purely cosmetic nature.) Subsequently, the Criminal Justice Act Revision of 1984, described *ante,* adjusted rates and ceilings upward to offset increases in legal costs nationally.

608–09 (D.D.C.1967).[5] Although the fee claim need not embrace exquisite detail, it should be adequate to limn the necessity for the services, their nature and extent, and an itemized account of the time involved.

In this case, following the procedure envisioned by *Naples, id.* at 609, the court returned the application to Barrister in a search for further elucidation. To the extent that the amended filing still lacks specificity, *see* text *post*, the applicant must bear the brunt of its short-comings. The process of approving fee applications cannot be turned into a ping-pong match, with defective petitions being shunted back and forth endlessly between the court and counsel.

Barrister qualifies without serious question for the balm of 18 U.S.C. § 3006A(d)(3). Her representation of Carnevale was sufficiently "extended;" the case occupied some five months between arraignment and verdict, the trial itself lasted for some twelve days (exclusive of jury empanelment), and pretrial motions were heard on several occasions. Although the Act offers no guide as to what constitutes "extended" service, the essence of the requirement is plainly temporal. *See Bailey,* 581 F.2d at 987. The court is satisfied that Carnevale's defense commanded a suitably substantial investment of productive time to meet this prong of the statutory test.

Inasmuch as the court finds that Barrister's representation was "extended," it is not essential that she show it was "complex" as well; § 3006A(d)(3) formulates a disjunctive standard in this respect.

Nevertheless, to give counsel her due, the court likewise notes that the complexity furculum of the statute was fulfilled here. The government brought a fifty-seven count indictment against six defendants.[6] The accusations ranged from conspiracy, 18 U.S.C. § 371, to a litany of charges involving various aspects of interstate transportation, concealment, and sale of stolen motor vehicles, 18 U.S.C. §§ 2312–2313, and interstate asportation of falsely-made securities (automobile title certificates). *See* 18 U.S.C. § 2314. Some twenty-seven different vehicles were described in the indictment. More importantly, the conspiracy was alleged to have lasted over a three year period (1979–1981) and to have encompassed hundreds of cars.[7] The government presented approximately sixty-six witnesses and offered scores of exhibits.

The Act provides no standard for when representation may be deemed "complex." Yet, the magnitude and intricacy of this case, the attendant avalanche of papers to be perused and sorted out, the variety of the transactions, and the diversity of the charges combined, in the context of a multi-defendant trial, to complicate the task of assigned defense counsel to a degree sufficient to merit the label "complex." The court so finds.

■ Barrister is entitled to "[p]ayment in excess of any maximum amounts provided in [18 U.S.C. § 3006A(d)(2) ] ... for extended or complex representation" of Carnevale in connection with the case at bar.

5. This is not to suggest that the applicant can place *no* reliance on the trial judge. In the prototypical case, the judge will have attained considerable familiarity with the dimensions and needs of the case and the quality of the attorney's services. And, "everyday judicial experience," *Bailey,* 581 F.2d at 989, will point the way to certain conclusions. Notwithstanding these eternal truths, the judge, unaided by counsel, will often be unable accurately to see behind the scenes or to appreciate the difficulties encountered by the lawyer.

6. Three defendants pled guilty in advance of trial, and four of the counts were dropped. Carnevale stood trial with the remaining pair of defendants (William Martin and James Rekrut) on a total of fifty-three counts.

7. The government had no proof whatever of Carnevale's involvement in the scheme before 1981. At the close of the prosecution's case, Barrister's motion to acquit her client on all of the pre-1981 charges was granted under Fed.R. Crim.P. 29(a).

## V.

Barrister's entitlement to extra remuneration does not end the court's inquiry. It is still necessary to examine the specifics of her application and to apply thereto the governing criteria. *See* text *ante* at Part III.

### A. *Trial Time.*

Barrister has claimed sixty-five hours of trial time. The clerk's records show somewhat less. The applicant has offered no itemization of these hours. The court is inclined, in such circumstances, not to hew strictly to the clerk's log. The court accepts sixty-three hours as a reasonable approximation. *See James*, 301 F.Supp. at 114 (discussing minimal discrepancies among records cataloguing time spent in open court).

Her claim of entitlement to the highest possible rate, $60 hourly,[8] cannot be accepted as easily. As noted *ante*, it is the exception rather than the rule to fund excess-compensation claims at maximal rates. In Barrister's case, it would be wholly unjustified to do so.

In the first place, Barrister is a fledgling lawyer; she was admitted to the Rhode Island bar on November 4, 1983 and admitted to practice before this court on March 29, 1985. This was apparently her maiden voyage in a criminal jury trial in federal district court. Even in precincts where the peculiar constraints of the Act are not operative, this court has been frugal in setting rates for "relative newcomers to the bar." *United Nuclear Corp. v. Cannon*, 564 F.Supp. 581, 589 (D.R.I.1983) ($40 per hour rate for inexperienced attorneys under 42 U.S.C. § 1988).[9]

Moreover, Barrister's services were not exceptional in any sense. Her handling of Carnevale's case was pedestrian. The court intends no slur; it is, however, in the interests of justice to point out that, while Barrister displayed average competence for an attorney of her tender years, she did not distinguish herself in any way. Though time-consuming, the trial was not especially arduous for Barrister. The government levelled its guns principally at codefendant Martin, and much of its proof had no bearing on the case against Carnevale. Barrister waived cross-examination as to a majority of the prosecution witnesses, and was extremely brief with most of the others. She made no opening statement. She elected (wisely) to present no rebuttal case. Her summation was straightforward.

■ To be sure, Carnevale's defense was successful; but, in the court's judgment, that result was largely attributable to the weakness of the prosecution's "proof" against him and to the abilities of seasoned counsel for his codefendants. Courts have not hesitated to prune rates or hours in cases where, though the defense was successful, the efforts of the attorney were lackluster. *See, e.g., Tutino*, 419 F.Supp. at 247. Indeed, even when defense counsel has "performed in accordance with the highest standards of the legal profession," *Hildebrandt*, 420 F.Supp. at 477, courts cannot give carte blanche to C.J.A. fee applications. *See also United States v. Lowery*, 261 F.Supp. 396, 397 (D.D.C.1966) (decided under the Act prior to the 1970 amendments).

Considering all of the criteria mentioned above, *see* text *ante* at Part III, and having in mind the pronouncements of the Plan, the court fixes $40 per hour as the appropriate rate at which Barrister's in-court time should be rewarded.

### B. *Court Time (Exclusive of Trial).*

Barrister claims an additional six hours of in-court time attendant upon pretrial

---

8. 18 U.S.C. § 3006A(d)(1) provides in pertinent part that:

    Any attorney appointed pursuant to [the Act] ... shall ... be compensated at a rate not exceeding $60 per hour for time expended in court or before a United States magistrate and $40 per hour for time reasonably expended out of court.

9. The court recognizes that the *Cannon* comparison is imprecise. Barrister was serving as sole counsel, not as a subordinate member of a litigation team. Yet, the analogy is useful.

hearings and the like. She also seeks two hours for jury empanelment (which occurred in advance of trial itself on an earlier date). The court has no legitimate quarrel with the amount of time proffered in these respects. There is no reason why the rate formulated for her trial involvement, *see* text *ante* at Part V (A), should not apply to these hours as well. The Act differentiates between time "expended in court" and "expended out of court." *See* 18 U.S.C. § 3006A(d)(1), quoted *ante* at n. 8. It does not distinguish among varieties of in-court time.

### C. *Time Expended Out of Court.*

This section of Barrister's petition presents the most nettlesome questions. She lays claim to a total of fifty-eight hours, all at the ceiling rate of $40 hourly. Her application, despite the attempt at augmentation, remains singularly inexplicit.

Barrister asserts, for example, that she engaged in eight pretrial conferences with her client, consuming a total of eight hours. She offers no specifics whatever: the court is at a loss to say whether these discussions were face-to-face or by telephone, or to gauge the relevance of, and/or necessity for, so many confabulations. (The heading of this section of her petition —"Interviews and Conferences"—indicates that some unspecified portion of this time was for something other than in-person interviews.) Such a bland "description is inadequate as a basis for a ruling that said time was reasonably expended." *James,* 301 F.Supp. at 133 (footnote omitted). Certainly, dialogue between a lawyer and a criminal defendant is an essential ingredient of any recipe for a successful defense, but counsel has an obligation to flesh out such a barebones scenario when she seeks excess compensation.

An application which is pockmarked by generalities renders it difficult for the court to assess the importance or the significance of the time expended. Especially in light of the relatively large number of aggregate hours which have been requisitioned in this matter, the attorney must be prepared to pay a price for such inadequacies in description. *See Thompson,* 361 F.Supp. at 884; *James,* 301 F.Supp. at 127; *Naples,* 266 F.Supp. at 608–09.[10]

The remaining portion of this claim deals with legal research, drafting and review of pleadings, obtaining and analyzing records, and other generically acceptable items. It totals forty hours. Yet, the asseveration fails on several major counts.

First, the court is aware that Barrister, for the most part, played a tagalong game. Her motions exhibited no signs of individual initiative; in the main, they were mirror images of those filed by other defendants. She furnished the court with little assistance by way of memoranda, *cf. Tutino,* 419 F.Supp. at 249–50, and she submitted no requests to charge. *See* Fed.R.Crim.P. 30. Neither her written submissions nor her oral arguments nor her performance in the courtroom bore the hallmarks of intensive preparation.

Second, many of Barrister's entries reflected the expenditure of time to bring herself to the starting gate of rudimentary legal proficiency. *E.g.,* "researched and copied law of conspiracy . . . and read some articles on elements and aspects of the crime of conspiracy from books;" "read books on jury selection and the impaneling process;" "read some articles in text books in reference to trying cases in federal court;" "researched the law on expert testimony and the methods of cross-examination of same, and how to discredit their testimony in front of the jury, . . . from

---

**10.** This court is loath to add unnecessarily to the flood of paperwork which has engulfed the bar and inundated the judicial system. And, the court is mindful that the time spent by an attorney in preparing a C.J.A. fee petition is not itself compensable. *James,* 301 F.Supp. at 131–32. Thus, the court does not require applications to be filed in exceedingly fine detail or in an elaborate format. Nonetheless, the purpose of the proffer is to enlighten, and the documentation must convey sufficient particulars to inform the court of what counsel has done, and why. Without such minimal imput, the inquiry is inevitably hampered, and the handicap ultimately redounds to the applicant's detriment.

American Jurisprudence and other text books. Also looked at the Federal Rules relating to expert testimony." The law is not a static discipline, and lawyers must constantly seek to expand the scope of their knowledge. Such industry is always to be commended. That is not to say, however, that it will bear immediate fruit, especially in the vineyards of the C.J.A.

It is settled beyond peradventure that the federal courts will not permit the Act to be used as a device to further the basic education of a lawyer at government expense. *Tutino*, 419 F.Supp. at 251. In the words of Judge Bazelon:

> [T]he bar has long required its members to maintain competence in the areas in which they are to practice, and it seems generally settled that an attorney may not properly charge his client for the time it takes the attorney to obtain general competence in a particular area of the law.

*Thompson*, 361 F.Supp. at 884–85 n. 12.

Having volunteered to take on criminal defense assignments, an attorney must bring to his or her appointment at least a basic understanding of procedural rules, evidentiary principles, statutory law, recurring issues, and landmark cases. Some research is *always* necessary in order to mount a vigorous defense, but it must start not from ground zero but from an acceptable plateau of expected knowledge. There is a lowest common denominator, and some of Barrister's work is beneath that level.[11]

Thirdly, there is considerable imbrication of charges. Ten hours are requisitioned for "obtaining and reviewing records," yet such work also comprises a part of the time logged under the "legal research" rubric (*e.g.*, Oct. 5, 1985, Oct. 6, 1985). The court must, of course, weed out such overlaps. And, the application reflects some obvious inaccuracies; for example, the time charged for preparation of closing argu-

ments and work anent jury instructed is noted as taking place *after* the charge conference, Fed.R.Crim.P. 30, had been held and counsels' summations delivered.

Lastly, the court notes that these proceedings, albeit protracted, created no discernible need for the performance of services under extraordinary pressures of time; that counsel displayed no remarkable knowledge or skill in her run-of-the-mine handling of the case; and that her relative inexperience showed.

Taking into account all of these elements, the court allows a total of thirty-four and one-half hours for reasonably productive out-of-court time expended by Barrister in Carnevale's defense, and fixes a rate of $28. per hour to remunerate that time.

### VI.

In the judgment of the court, Barrister is entitled to an award of fees under 18 U.S.C. § 3006A(d)(3) for the reasons stated. Her representation of Carnevale in this extended and complex litigation is deserving of recompense in a higher overall amount than that allowed ($2000) in such cases by 18 U.S.C. § 3006A(d)(2). But, her entitlement is somewhat less than she has forecast in her fee application.

The court finds that Barrister is eligible to receive excess compensation in the aggregate amount of $3806, based upon seventy-one hours of time expended in court at a rate of $40 per hour ($2840) and thirty-four and one-half hours of non-court time at a rate of $28 per hour ($966). Barrister has sought no expense reimbursement, 18 U.S.C. § 3006A(e)(2), so none is awarded. The court will therefore transmit the application sub judice and certify to the chief judge of this circuit that payment in such an amount is requisite to provide fair compensation for Ms. Barrister under the Act.[12]

---

11. The rule is neither unduly harsh nor close-fisted. Even in private practice, much the same holds true. Continuing legal education is often a capital investment in an attorney's future rather than a shortterm source of profit on a given case.

12. Although Barrister cannot be held responsible for some of the time which was "wasted"

**390**

An eschatocol of sorts may be in order. This court takes boundless pride in the spirit and dedication of the members of our bar, the majority of whom have been ready and willing to assist indigents before this court, frequently at considerable personal sacrifice. Ms. Barrister is one of that number, and the court has no doubt but that, given time and experience, she will reflect great credit on herself and on the justice system. Lawyers hold themselves in high esteem—and with good reason. Thus, it is always unpleasant to trim counsel fee requests; it is doubly so in the C.J.A. context. Yet, no judge worth his or her salt shrinks from the proper decision of a matter simply to indulge personal tastes or distastes.

The Congress has balanced competing considerations in the enactment of the Criminal Justice Act. It has, on the one hand, provided for the adequate representation of accused persons who are unable to afford private counsel. On the second hand, it has agreed to compensate lawyers for furnishing those services, but only to a degree sufficient to stave off economic hardship. The Act leaves no margin of profit. It falls to the courts, therefore, to hold this delicate balance steady and true. It is a thankless chore—and one which cannot be accomplished by accommodation, by blindly accepting every hour spent by counsel as fully reimbursable, by awarding excess compensation routinely, or by automatically endorsing the use of maximum rates in every case.

in this matter—the court defines "waste" in terms of time profligately expended without any incremental profit to the rights and interests of the defendant—she earns no credit for any notable conservation of time or judicial resources.

Unlike defense counsel in *Ursini, supra,* she was neither a "leavening influence in the case," nor did her "economical use of time [ ] result[ ] in a saving of many, many hours—perhaps days—of trial time." 296 F.Supp. at 1158.