**UNITED STATES of America,**

**v.**

**Jeffrey JOHNSON, Defendant.**

**No. CRIM. 00–419–03.**

United States District Court,
E.D. Pennsylvania.

Aug. 14, 2002.

Frank R. Costello, Jr., U.S. Attorney's Office, Philadelphia, PA, for U.S.

Jerry S. Goldman, Jerry S. Goldman & Assoc., PC, Philadelphia, PA, for defendant.

### MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

Before the court is a Criminal Justice Act ("CJA") voucher of Jerry S. Goldman, Esq., who represented defendant Jeffrey Johnson in this case. On December 20, 2000, defendant Johnson was convicted of conspiracy to distribute cocaine base, commonly known as crack, in violation of 21

U.S.C. § 846. Defendant was later sentenced to 360 months incarceration. Following the sentencing, Mr. Goldman submitted a CJA voucher, seeking fees and costs in the amount of $42,038.02. In light of the amount of the CJA voucher, careful scrutiny of Mr. Goldman's voucher is appropriate. To this end, the court held a hearing and requested written submissions from Mr. Goldman in support of his voucher. For the reasons that follow, the voucher will be approved.

## I. BACKGROUND

On July 18, 2000 the grand jury returned an indictment against defendant Jeffrey Johnson and eight other defendants charging the defendants with conspiracy to distribute over 50 grams of crack in the Spring Garden Housing Project in the city of Philadelphia between March 11, 1999 and January 11, 2000. The indictment alleged that the leader of the conspiracy, Jeffrey Hunt, packaged cocaine base for distribution in clear gelcaps labeled "357" and in clear vinyl tubing capped with wooden dowels. Five defendants pleaded guilty before trial. The remaining four proceeded to trial, where, after a two week trial, the jury found the defendants, including defendant Johnson, guilty on all counts.

On September 12, 2000, Mr. Goldman was appointed counsel for defendant Johnson. At first glance, the case appeared to be a routine drug conspiracy matter devoid of legal or factual complexity. Defendant's initial theory of defense (there was overwhelming evidence that the defendant sold drugs) was that, while he admitted being a drug dealer, he was not a member of the conspiracy charged in the indictment. In other words, the defendant claimed he was an independent contractor working on his own and not a part of any organization. Counsel prepared for trial by visiting the scene of the conspiracy, reviewing documents produced by the government and interviewing witnesses. Shortly before trial, counsel learned that there were other state criminal matters that were related to this case. According to the defendant, other individuals were selling crack in gelcaps in the vicinity of the conspiracy that were marked differently than those used by the Hunt organization. This type of evidence, if true, would support the defendant's theory that others besides the Hunt organization were selling drugs in the area and that he sold drugs for those individuals as a free-lance dealer just as he sold drugs for the Hunt organization. This disclosure required counsel to conduct an extensive factual inquiry into other cases where the government had prosecuted other drug organizations.

Also shortly before and during trial, counsel sought additional discovery on several additional issues. Counsel learned that Jeffrey Hunt, the leader of the conspiracy, was cooperating with the government and would be called as a government witness at trial. Counsel took the lead among the various defendants' counsel in investigating Jeffrey Hunt's background, including his extensive criminal history, and his anticipated testimony. Counsel also took the lead in investigating defendant's contention he had been approached by a former police officer at the Federal Detention Center who indicated that the officers involved in this case had a history of fabricating evidence.

During trial, counsel essentially assumed the mantle of lead counsel. He conducted extensive cross examination of the government's witnesses and drafted detail summaries of records and other documents. Counsel shared this information with the other counsel. Counsel took the lead in drafting pretrial memoranda and filed several motions, including a motion to exclude

the government's expert witness, an ex parte motion to obtain records, and a motion pursuant to *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), regarding the role of the judge and jury in determining the weight of the drugs involved in the conspiracy.

After trial, prior to sentencing, counsel filed a motion for a new trial based upon the alternative theories of constructive amendment of the indictment or improper variance of the indictment. Additionally, in the course of reviewing the file in preparing the motion for a new trial, counsel learned of a police report that appeared to contradict the statements and the theory of the government as to what drugs were being sold and what packaging was being used in the area of the Hunt conspiracy. The document suggested that there were gelcaps found with the markings "157" within the area. Learning of this document, as well as other information concerning individuals selling drugs in the area, counsel filed a supplemental posttrial motion concerning possible violations of the rule of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The court denied the defendant's motions for a new trial, and the defendant subsequently appealed these matters to the Third Circuit.

Finally, prior to sentencing, counsel extensively briefed several issues concerning the calculation of the quantity of drugs involved in the conspiracy and the amount of drugs attributable to the defendant. The court held a joint sentencing hearing addressing sentencing issues common to all defendants, and also held individual sentencing hearings for each of the defendants. The court ultimately denied the defendant's objections and adopted the arguments of the government concerning the calculations of the amount of drugs attributable to the defendant.

## II. DISCUSSION

The Criminal Justice Act (CJA) provides for compensation for attorneys appointed to represent indigent criminal defendants. The CJA sets forth maximum hourly rates but also provides that the Judicial Conference may increase those hourly maximums if the Judicial Conference determines that a higher rate is justified. *See* 18 U.S.C. § 3006A(d)(1). Prior to April 1, 2001, the maximum hourly rates in the Eastern District Pennsylvania were $50 an hour for out-of-court time and $70 an hour for in-court time. After April 1, 2001, the maximum hourly rates were increased to $55 an hour for out-of-court time and $75 an hour for in-court time.[1]

In addition to providing maximum hourly rates, the CJA also provides for the maximum total fees of $5,200 for representation of a defendant in a case in which one or more felonies are charged. *See id.* at § 3006A(d)(2). Nevertheless, payment in excess of $5,200 "may be made for extended or complex representation when the court in which the representation was rendered ... certifies that the amount of the excess payment is necessary to provide fair compensation and the payment is approved by the chief judge of the circuit." *Id.* at § 3006A(d)(3)

Although the court does not have the authority to raise the maximum hourly rate,[2] *see United States ex rel. Kubat v.*

---

1. Maximum hourly rates increased to $90 an hour for both out-of-court and in-court time after May 1, 2002. Nevertheless, Mr. Goldman seeks no compensation for work performed after that date.

2. Mr. Goldman noted that his regular billing rate during the time covered by the CJA voucher was $285 dollars per hour. Since he claims expenses of approximately $175–200 per hour, Mr. Goldman argues that he operat-

*Thieret,* 690 F.Supp. 725, 728 (N.D.Ill. 1988) ("the guidelines instruct that the rates prescribed in the CJA are maximum rates are to be respected as such"), the court may waive limits on counsel's total maximum fee. This discretion is informed by a two-pronged analysis set forth in the statute: (1) whether the attorney's representation was "extended or complex" justifying waiver of the maximum; and (2) what amount of fees is "fair compensation." 18 U.S.C. § 3006A(d)(3). *See, e.g., United States v. Diaz,* 802 F.Supp. 304, 307 (C.D.Cal.1992).

### A. *"Extended or Complex Representation"*

Under the first prong of the analysis of whether to raise the maximum amount of the total fee, the representation need be either, but not necessarily both, "extended" or "complex." *See United States v. Bailey,* 581 F.2d 984, 987 (D.C.Cir.1978). In this case, the court concludes that although the period of representation was not necessarily "extended," the representation was "complex." Counsel served as the lead counsel in a two week jury trial where he performed well. He appears to have prepared thoroughly, and followed up on all leads. In addition counsel filed pretrial memoranda prior to trial and a series of motions during trial, including a motion concerning the recent Supreme Court opinion of *Apprendi v. New Jersey,* involving the issue of the proper role of the judge and the jury in determining drug weight calculations. Post trial, counsel filed a series of complex legal motions raising issues involving improper variance, constructive amendment of the indictment, and *Brady* violations. Finally, with regard to sentencing, counsel also raised several complex issues regarding the proper amount of drugs attributable to each de-

fendant. Thus, the court finds that the representation provided by counsel was indeed "complex."

### B. *"Fair Compensation"*

In determining whether the fee constitutes "fair compensation," courts should consider the following factors:

1) responsibilities involved measured by the magnitude and importance of the case;

2) manner in which duties were performed;

3) knowledge, skill, efficiency, professionalism, and judgment required of and used by counsel;

4) nature of counsel's practice and injury thereto;

5) any extraordinary pressure of time or other factors under which services were rendered; and

6) any other circumstances relevant and material to a determination of a fair and reasonable fee.

Administrative Office of the United States Courts, Guide to Judiciary Policies and Procedures, Chap. II, Part C, § 2.22B(3). *See also United States v. McVeigh,* 918 F.Supp. 1452, 1460 (W.D.Ok.1996); *United States v. Diaz,* 802 F.Supp. at 308.

With regard to the "fairness" prong, courts have consistently provided that the requirement that the fee be "fair" does not mean that the compensation must be "full." *See United States v. Carnevale,* 624 F.Supp. 381, 384 (D.R.I.1985); *United States v. Jewett,* 625 F.Supp. 498, 500 (W.D.Mo.1985). As the court in *Carnevale* noted, "a substantial element of appointed counsel's representation under the act remains public service." 624 F.Supp. at 384. *See also United States v. Cook,* 628 F.Supp. 38, 41 (D.Co.1985) ("Such appoint-

ed at a loss for work performed at the maximum rates set by the CJA.

ments are to protect the rights of the indigent accused, and they are neither to be sought nor made for the purpose of providing income to attorneys").

Analyzing the criteria for determining whether such representation was fair suggested by the Administrative Office of the Courts, the court concludes that the full amount requested by counsel is, indeed, fair and appropriate in this case.

One, the case involves a drug conspiracy for which the defendant, as a career offender, faced a potential life sentence. Two, Mr. Goldman performed his duties skillfully. Three, Mr. Goldman has practiced in the Commonwealth of Pennsylvania and the State of New York for over 25 years, including six years of service as a prosecutor in New York City. He has also handled a variety of CJA appointments during the last sixteen years.[3] Indeed, counsel's normal billing rate during the period of his representation of the defendant was $285 per hour. If compensated at his "market rate," counsel's fee request would be in excess of $200,000. Counsel notes that with hourly expenses of approximately $175–200, the CJA rates, which provide for at most $75 per hour during in-court time, resulted in an operating loss for counsel. Fourth, involvement in his case, because of the intensity of the commitment over a period of time had a disruptive effect on Mr. Goldman's practice.

That Mr. Goldman's advocacy did not produce an acquittal, or result in a significant decrease in prison time for the defendant, does not detract from Mr. Goldman's performance. The charge of appointed counsel, indeed any criminal lawyer, is not to obtain a particular result. Rather, defense counsel fulfills his responsibilities by developing a strategy and a theory of the case, researching the legal issues thoroughly, investigating the factual issues diligently, producing witnesses and other evidence favorable to the defense, preparing for direct and cross examination of witness and for opening and closing statements, filing appropriate motions which raise relevant issues, and by, at all times, conducting the defense of the case with uncompromised zeal. Measuring Mr. Goldman's conduct against this charge, the court finds that he properly discharged his duties and that, therefore, the requested compensation is, under the circumstances, fair.

## III. CONCLUSION

The court therefore finds that the CJA voucher submitted by Mr. Goldman accurately represents the amount of time contributed to this case and provides fair compensation for his representation of defendant Jeffrey Johnson. Under the circumstances, the court therefore will waive the limits on counsel's total maximum fee, having found that the case was particularly complex and the amount of the fee provides "fair compensation."

---

3. In *Carnevale,* the district court approved compensation above the limits set forth in the statute, but did not grant the full amount of the request. The court noted that full compensation was not appropriate, in part because the attorney was a "fledgling lawyer" and a "relative newcomer[] to the bar," whose participation in this case "was apparently her maiden voyage in a criminal jury trial in federal district court." 624 F.Supp. at 387. Such is not the case with Mr. Goldman, who is an experienced and skillful attorney.