**UNITED STATES of America, Plaintiff,**

v.

**Timothy James McVEIGH and Terry Lynn Nichols, Defendants.**

**No. CR–95–110 MH**

United States District Court,
W.D. Oklahoma.

Jan. 24, 1996.

Patrick M. Ryan, U.S. Attorney for Western District of Oklahoma, Joseph Hartzler, Special Assistant U.S. Attorney, Assigned from S.D. Illinois, Larry Mackey, Trial Counsel, Assigned from S.D. Indiana, Oklahoma City, OK, for plaintiff.

Stephen Jones, Robert Nigh, Jr., Jones, Wyatt & Roberts, Enid, OK, Richard H. Burr III, Houston, TX, for defendant McVeigh.

Michael Tigar, Austin, TX, Ronald C. Woods, Houston, TX, D. Kate Rubin, Deputy Federal Public Defender, Oklahoma City, OK, for defendant Nichols.

Clyde A. Muchmore, Harvey D. Ellis, Jr., Crowe & Dunlevy, Oklahoma City, OK, for Combined Comm. Corp. of Okla Inc.

Michael Minnis, David McCullough, Michael Minnis & Associates, Oklahoma City, OK, for The Media Group.

Robert D. Nelson, Hall, Estill, Hardwick, Gable, Golden & Nelson, Oklahoma City, OK, for The National Media Group.

S. Douglas Dodd, Michael C. Redman, Doerner, Saunders, Daniel & Anderson, Tulsa, OK, for The Dallas Morning News.

Paul C. Walter, Stefani I. Silverberg, Jenkins & Gilchrist, Dallas, TX, for The Dallas Morning News.

## MEMORANDUM OPINION AND ORDER ON MEDIA MOTIONS

MATSCH, Chief Judge.*

Combined Communications Corporation of Oklahoma, Inc. (KOCO–TV), the Dallas Morning News, Capital Cities/ABC, Inc., CBS, Inc., Fox News, Inc., National Broadcasting Co., Inc., Cable News Network, Inc.,

---

* Chief Judge Richard P. Matsch, District of Colo-rado, sitting by designation.

**1456**

the Chronicle Publishing Company (d/b/a The San Francisco Chronicle), the New York Times Company, Philadelphia Newspapers, Inc. (d/b/a the Philadelphia Inquirer and the Philadelphia Daily News), Seattle Times Co., The Washington Post, and Time Inc. (collectively "National Media Group"), FOI Oklahoma, Inc., The Associated Press, The Daily Oklahoman, The Tulsa World, KFOR–TV Channel 4, KWTV Channel 9, KJRH Channel 2 (Tulsa), Society of Professional Journalists Oklahoma City Chapter and Society of Professional Journalists Eastern Oklahoma Chapter (collectively "Media Group"), have filed motions asking that documents filed in this case under seal be unsealed where appropriate, that the clerk be directed to provide public access to a complete copy of the docket sheets and that procedures be established for consideration of future requests that documents be sealed or proceedings be closed to the public.

■ These motions were accepted for filing in this case even though the movants are not parties to the proceeding. The government and each of the defendants have filed responses to these motions and oral arguments were heard on December 13, 1995. The motions raise important questions under the First, Fifth and Sixth Amendments to the United States Constitution. The movants have standing to present these questions on behalf of themselves and the general public. They are not, however, parties to this criminal proceeding and the motions are more appropriately considered as a collateral or ancillary civil action in the nature of a petition for a writ of mandamus under the All Writs Act, 28 U.S.C. § 1361, directed to the clerk of this district court.

There are fundamental values served by publicity in the administration of criminal justice. Chief Justice Burger articulated them as follows:

> The early history of open trials in part reflects the widespread acknowledgment, long before there were behavioral scientists, that public trials had significant community therapeutic value. Even without such experts to frame the concept in words, people sensed from experience and observation that, especially in the adminis-

tration of criminal justice, the means used to achieve justice must have the support derived from public acceptance of both the process and its results.

> When a shocking crime occurs, a community reaction of outrage and public protest often follows. Thereafter, the open processes of justice serve an important prophylactic purpose, providing an outlet for community concern, hostility, and emotion. Without an awareness that society's responses to criminal conduct are underway, natural human reactions of outrage and protest are frustrated and may manifest themselves in some form of vengeful "self-help," as indeed they did regularly in the activities of vigilante "committees" on our frontiers. "The accusation and conviction or acquittal, as much perhaps as the execution of punishment, operat[e] to restore the imbalance which was created by the offense or public charge, to reaffirm the temporarily lost feeling of security and, perhaps, to satisfy that latent 'urge to punish.' "

> Civilized societies withdraw both from the victim and the vigilante the enforcement of criminal laws, but they cannot erase from people's consciousness the fundamental, natural yearning to see justice done—or even the urge for retribution. The crucial prophylactic aspects of the administration of justice cannot function in the dark; no community catharsis can occur if justice is "done in a corner [or] in any covert manner." It is not enough to say that results alone will satiate the natural community desire for "satisfaction." A result considered untoward may undermine public confidence, and where the trial has been concealed from public view an unexpected outcome can cause a reaction that the system at best has failed and at worst has been corrupted. To work effectively, it is important that society's criminal process "satisfy the appearance of justice," and the appearance of justice can best be provided by allowing people to observe it.

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 570–572, 100 S.Ct. 2814, 2824, 65 L.Ed.2d 973 (1980) (citations omitted).

Those words aptly describe the reasons for news media interest in this case and the frustration reflected in the subject motions. The docket sheets reveal a routine practice of sealing documents without adequate recognition of the public interest in obtaining information concerning the progress of this criminal proceeding. Many entries give only a data base number with the phrase "Sealed (In vault)" without any identification of the source of the document, the nature of it, the reason for not including it in the case file or who directed or authorized such secrecy. Some limited identification of the nature and source of some of the documents has been provided by attorneys in complying with directions from Magistrate Judge Howland. A summary was submitted by the movants in their status report filed on October 27, 1995. Several hundred documents have been sealed. Many more papers of the same or similar kind will be submitted as the case progresses. The court must now establish standards for a system of records control to evaluate claims for secrecy and for the exercise of the discretionary authority to restrict public access to information.

A review of first principles will assist in identifying useful criteria for balancing the conflicting interests at each stage of the proceeding. This analysis will permit classification of individual items within a system of presumptions.

■ Every criminal prosecution in a federal court begins with some investigation by one or more law enforcement agencies of government to develop an evidentiary base for the necessary showing of probable cause. The documents generated during the investigation and the conduct of the investigators are largely shielded from public view. Specific privileges to withhold information, for example, the informer's privilege, have been recognized. *Matter of Search of 1638 E. 2nd St., Tulsa, Okl.*, 993 F.2d 773, 774 (10th Cir.1993). Preserving the integrity of the factual inquiries, encouragement of people to come forward with information, avoidance of flight and destruction of evidence and protection of the reputations of innocent people are among the reasons given in support of such secrecy. These same reasons have been ex-pressed in support of the policy of grand jury secrecy, discussed later.

Records of all agencies of government have historically been open to public inspection under the common law of this country. *See, e.g., McCoy v. Providence Journal Co.*, 190 F.2d 760, 765–66 (1st Cir.), *cert. denied*, 342 U.S. 894, 72 S.Ct. 200, 96 L.Ed. 669 (1951). That principle is consistent with the basic premise of democracy—that government is the servant of the people.

In 1974, Congress enacted the Freedom of Information Act, ("Act") P.L. 93–502, now appearing in 5 U.S.C.A. § 552. The premise of the Act is that records of all agencies of the executive branch of the federal government should be open to public view. The importance of the legislation was succinctly stated in the following paragraph from House Report No. 1497:

It is vital to our way of life to reach a workable balance between the right of the public to know and the need of the Government to keep information in confidence to the extent necessary without permitting indiscriminate secrecy. The right of the individual to be able to find out how his Government is operating can be just as important to him as his right to privacy and his right to confide in his Government. This bill strikes a balance considering all these interests.

H.R.Rep. No. 1497, 89th Cong., 2nd Sess. 6, *reprinted in* 1966 U.S.C.C.A.N. 2418, 2423. Congress excepted law enforcement agency records from the policy of openness. Section (b)(7) of 5 U.S.C. § 552 denies public access to the following records and information:

(7) records of information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution

which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected ·to endanger the life or physical safety of any individual;

Executive branch agencies are also authorized to exclude information by section (c)(1) of the Act, as follows:

(c)(1) Whenever a request is made which involves access to records described in subsection (b)(7)(A) and—

(A) the investigation or proceeding involves a possible violation of criminal law; and

(B) there is reason to believe that (i) the subject of the investigation or proceeding is not aware of its pendency, and (ii) disclosure of the existence of the records could reasonably be expected to interfere with enforcement proceedings,

the agency may, during only such time as that circumstance continues, treat the records as not subject to the requirements of this section.

█ A law enforcement agency may seek assistance from the court during the investigation while it is still secret. If the statutory criteria are met, investigators may obtain orders authorizing the interception of wire, oral or electronic communications following the procedure prescribed in 18 U.S.C. § 2518. Subsection (8)(b) of § 2518 directs that such applications and orders shall be sealed by the judge and custody of them "shall be wherever the judge directs." The statute specifically mandates that the applications and orders for interceptions shall be disclosed "only upon a showing of good cause before a judge of competent jurisdiction."

█ Search warrants may be issued under Rule 41 of the Federal Rules of Criminal Procedure from a federal magistrate judge or a state judge upon request of a federal law enforcement officer or a government attorney. Return of the search warrant with an inventory of the property taken is to a federal magistrate judge who shall file them with the clerk of the district court. These are public records at that time.

Ultimately the results of the investigation are presented to a grand jury, unless the defendant waives indictment. Historically, grand jury proceedings have been secret. In 1944, Rule 6 of the Federal Rules of Criminal Procedure was adopted and grand jury secrecy was formalized. The Supreme Court summarized the policy predicates for grand jury secrecy in *Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 219, 99 S.Ct. 1667, 1673, 60 L.Ed.2d 156 (1979):

First, if preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony. Moreover, witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements. There also would be the risk that those about to be indicted would flee, or would try to influence individual grand jurors to vote against indictment. Finally, by preserving the secrecy of the proceedings, we assure that persons who are accused but exonerated by the grand jury will not be held up to public ridicule.

Proceedings before the grand jury are recorded but the recordings or reporter's notes and transcripts remain in the custody or control of the government's attorneys. Fed. R.Crim.P. 6(e)(1). Grand jurors, interpreters, stenographers, typists and government attorneys are prohibited from disclosing matters occurring before the grand jury, except as provided in Fed.R.Crim.P. 6(e)(3). Courts may order disclosure on *ex parte* petitions by the government and upon such notice as the court may direct upon petitions by others. Fed.R.Crim.P. 6(e)(3)(C). Court hearings on matters affecting . a grand jury must be

closed to the extent necessary to prevent disclosure of matters occurring before a grand jury. Fed.R.Crim.P. 6(e)(5). Records, orders and subpoenas relating to grand jury proceedings are required to be kept under seal "to the extent and for such time as is necessary to prevent disclosure of matters occurring before a grand jury." Fed. Rule Crim.P. 6(e)(6).

■ Secrecy continues even after indictment and courts have no authority to review a grand jury's probable cause finding,. *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956), or to dismiss because of misconduct by attorneys or witnesses except in extraordinary circumstances. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254, 108 S.Ct. 2369, 2373, 101 L.Ed.2d 228 (1988). Even government counsel are excluded from the room during grand jury deliberations. In short, a federal grand jury's proceedings are shrouded in nearly absolute secrecy.

The appearance of a defendant in response to a criminal complaint, an indictment, or an information begins the adversary process directed towards determining the sufficiency of the government's evidence to establish the factual elements of the charged offense beyond a reasonable doubt. That determination is ordinarily made by a jury after a public trial, as required by the Sixth Amendment, conducted according to procedures and limitations assuring fundamental fairness within the guarantee of due process of law in the Fifth Amendment.

■ Although the Sixth Amendment protects the right of the accused to a public trial, it has long been clear that the public and the press also have a right to attend criminal trials. *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 603, 102 S.Ct. 2613, 2618, 73 L.Ed.2d 248 (1982). No integral part of the trial, including jury selection, can be closed to the public. *Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 505, 104 S.Ct. 819, 821–22, 78 L.Ed.2d 629 (1984) (*"Press—Enterprise I"*). That right extends to a preliminary hearing. *Press–Enterprise Co. v. Superior Court*, 478 U.S. 1, 7–9, 106 S.Ct. 2735, 2739–40, 92 L.Ed.2d 1 (1986) (*"Press–Enterprise II"*).

Other types of hearings may be held before trial, depending upon the complexity of the case. Motions under Fed.R.Crim.P. 12(b) frequently require the taking of evidence and hearings on such motions are normally part of the public process of adjudication.

■ Preparation for the defense of those accused of criminal conduct roughly parallels the government's pre-charge investigation. The defendant may obtain discovery and inspection of government information under Fed.R.Crim.P. 16. Defense counsel must go well beyond such discovery. The advocate for the accused has both an ethical obligation and a constitutional duty to conduct a thorough factual investigation and legal analysis. *See* ABA, Standards for Criminal Justice, Standard 4–4.1 and Commentary. In capital cases, that duty includes preparation for a possible penalty phase of trial. Inadequate defense investigation, including the failure to investigate all plausible lines of defense, constitutes ineffective representation requiring reversal of a conviction on constitutional grounds. *Osborn v. Shillinger*, 861 F.2d 612, 627 (10th Cir.1988). The focus of a defense lawyer's efforts is to assess the ability of the prosecution to establish guilt under the law and within the rules of evidence and procedure—not guilt in any moral or ethical sense. ABA Standards for Criminal Justice, Standard 4–4.1 and Commentary at 4.54– 4.55.

■ The lawyers themselves are subject to requirements of confidentiality during this period of preparation for trial. The attorney-client privilege and the work product doctrine protect some information from opposing counsel. The Department of Justice has used its rule-making authority to restrict public release of information in 28 C.F.R.— § 50.2. Professional ethics applicable to advocates as officers of the court limit what all counsel may reveal publicly. Local Rule 27 in this district sets out the general guidelines. It recognizes the authority of the court to impose additional limitations. These provisions are necessary to assure the fairness of the proceedings and to emphasize

that trials are conducted inside the court-room under the supervision of the presiding judge rather than on the courthouse steps. The news media and the public are spectators, not participants, in the process of adjudication.

Apart from the requirements of reciprocal disclosure to government counsel in Fed. R.Crim.P. 16(b), the investigation and trial preparation by defense counsel are conducted secretly. If the defendant has adequate financial resources, the only court involvement is to conduct hearings to assist the defense in obtaining access to information and evidence on motions and applications pursuant to the rules of criminal procedure.

A defendant unable to pay for his defense is in very different circumstances. He must rely on the court's authority under the Criminal Justice Act, 18 U.S.C. § 3006A, for payment for counsel, investigators, experts and any other services necessary for adequate representation pursuant to plans approved by the judicial council of each circuit under the supervision of the Director of the Administrative Office of the United States Courts within guidelines promulgated by the Judicial Conference of the United States.

■■■ Those guidelines require the use of prescribed forms for appointment of counsel, for authorization and payment for services other than counsel and for compensation of those providing services within the limitations established by the Judicial Conference. *See* VII Administrative Office of the United States Courts, *Guide to Judiciary Policies and Procedures*, Chaps. I–V. Case compensation maximum amounts may be waived and payments in excess of statutory limits may be made only with approval of the chief judge of the circuit or an active circuit judge to whom such authority has been delegated. Such excess payments require a finding that the case is "extended or complex," and fair compensation is determined by use of the criteria set out in the following paragraph:

> After establishing that a case is extended or complex, the approving judicial officer should determine if excess payment is necessary to provide fair compensation. The following criteria, among others, may be useful in this regard: responsibilities involved measured by the magnitude and importance of the case; manner in which duties were performed; knowledge, skill, efficiency, professionalism, and judgment required of and used by counsel; nature of counsel's practice and injury thereto; any extraordinary pressure of time or other factors under which services were rendered; and any other circumstances relevant and material to a determination of a fair and reasonable fee.

*Id.* at Chap. II, Part C, § 2.22B(3).

The guidelines provide for secrecy in seeking authority for obtaining services other than counsel in the following paragraph:

> *Ex parte* applications for services other than counsel under subsection (e) shall be heard *in camera*, and shall not be revealed without the consent of the defendant. The application shall be placed under seal until the final disposition of the case in the trial court, subject to further order of the court. Maintaining the secrecy of the application prevents the possibility that an open hearing may cause a defendant to reveal his or her defense. Appointed counsel shall not be required to submit evidence of a prior attempt to enter into a stipulation with the United States Attorney as a prerequisite to obtaining services under subsection (e). The court may encourage counsel to enter into stipulations, in the interest of expedition and economy, without, however, disclosing the contents or otherwise compromising the secret nature of the *ex parte* application.

*Id.* at Chap. III, Part A, § 3.03.

Chapter V of the Administrative Office guidelines regarding appointment of counsel contains the following section concerning release of information:

> *Procedures for the Release of Information Pertaining to Criminal Justice Act Activities.* Neither the Freedom of Information Act (5 U.S.C. § 552) nor the Privacy Act (5 U.S.C. § 552a) applies to the Judiciary and neither is applicable to requests for release to the public of records and information pertaining to Criminal Justice Act activities.

Generally, such information which is not otherwise routinely available to the public should be made available unless it is classified pursuant to an executive order or its release might adversely affect the national defense or foreign policy interests of the United States, unduly intrude upon the privacy of attorneys or defendants or compromise defense strategies, investigative procedures, attorney work product, the attorney-client relationship or privileged information provided by the defendant or other sources (see 5 U.S.C. § 552(b)).

Upon request, or upon the court's own motion, documents pertaining to Criminal Justice Act activities maintained in the clerk's open files, which are generally available to the public, may be judicially placed under seal or otherwise safeguarded until after all judicial proceedings in the case are completed and for such time thereafter as the court deems appropriate. Interested parties should be notified of any modification of such an order.

Requests for release of information pertaining to Criminal Justice Act activities in the custody of the Administrative Office will be disposed of in accordance with internal directives of that office.

*Id.* at Chap. V, § 5.01. It is noteworthy that this section makes reference to 5 U.S.C. § 552(b), containing the exceptions for public disclosure of law enforcement agency records.

Congress has recognized the special nature of offenses punishable by death. A very old statute, with amendments, now found at 18 U.S.C. § 3005 provides:

Whoever is indicted for treason or other capital crime shall be allowed to make his full defense by counsel; and the court before which the defendant is to be tried, or a judge thereof, shall promptly, upon the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases, and who shall have free access to the accused at all reasonable hours. In assigning counsel under this section, the court shall consider the recommendations of the Federal Public Defender organization, or, if no such organization exists in the district, of the Administrative Office of the United States Courts. The defendant shall be allowed, in his defense to make any proof that he can produce by lawful witnesses, and shall have the like process of the court to compel his witnesses to appear at his trial, as is usually granted to compel witnesses to appear on behalf of the prosecution.

In enacting the Anti-Drug Abuse Act of 1988, Congress extended the death penalty to persons engaging in a "continuing criminal enterprise" when any intentional killing results, and in Title VII of the enactment, provided for full support for defense services in all capital cases. The operative language appears at 21 U.S.C. § 848(q) as follows:

(9) Upon a finding in ex parte proceedings that investigative, expert or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or sentence, the court shall authorize the defendant's attorneys to obtain such services on behalf of the defendant and shall order the payment of fees and expenses therefore, under paragraph (10). Upon a finding that timely procurement of such services could not practicably await prior authorization, the court may authorize the provision of and payment for such services nunc pro tunc.

(10) Notwithstanding the rates and maximum limits generally applicable to criminal cases and any other provision of law to the contrary, the court shall fix the compensation to be paid to attorneys appointed under this subsection and the fees and expenses to be paid for investigative, expert, and other reasonably necessary services authorized under paragraph (9), at such rates or amounts as the court determines to be reasonably necessary to carry out the requirements of paragraphs (4) through (9).

Authorization for payment of attorneys' fees and for support services for the defense of an indigent person accused of a capital offense must be obtained from the district judge assigned to the case. Appointed counsel file applications explaining the need for the services requested in much the

same manner as in cases under the Criminal Justice Act although the statutory and guideline limitations for other felony cases are not applicable.

The Judicial Conference promulgated separate guidelines for representation in death penalty cases. *See* VII Administrative Office of the United States Courts, *Guide to Judiciary Policies and Procedures,* Chap. VI. Section 6.02A provides as follows:

> *Inapplicability of CJA Hourly Rates and Compensation Maximums.* In accordance with section 848(q)(10) of title 21, U.S.C., an attorney appointed to represent a defendant charged with a federal capital crime or seeking to vacate or set aside a death sentence in a proceeding under section 2254 or 2255 of title 28, U.S.C., shall be compensated at a rate and in an amount determined exclusively by the presiding judicial officer to be reasonably necessary to obtain qualified counsel to represent the defendant, without regard to CJA hourly rates or compensation maximums. Unlike appointments in non-capital cases under the CJA, there is no provision for review and approval by the chief judge of the circuit in federal capital prosecutions or in death penalty federal habeas corpus proceedings.

Similarly, the CJA limitations for compensation for investigative, expert and other services are made inapplicable in section 6.03B. Special forms, different from the CJA vouchers, are used in submitting *ex parte* requests for payment in death penalty cases. These forms, identified as CJA Form 30 for compensation to counsel and CJA Form 31 for expert and other services, require detailed descriptions of services performed including the time spent and dates of service.

In reviewing these applications, the court must rely on the experience and integrity of defense counsel, who have a duty to guard against improperly influencing the court in these *ex parte* communications and to protect privileged information. There are no "probable cause" or other standards to apply as with *ex parte* submissions by government counsel when court orders are necessary during the pre-charge investigation.

Authorization for expenditures of public funds to assist in preparation of a defense is not the traditional work of judges. There is no adversary to challenge the request and there is no evidentiary context within which the reasonableness of it may be evaluated. The more complex the case, the greater the difficulty. The judge as gatekeeper for the fisc has a ministerial duty to exercise restraint while the judge as protector of the due process necessary for a fair trial must indulge the defense all benefit of every doubt.

The denial of a request for expert or other services may result in the reversal of a conviction. *See, e.g., United States v. Crews,* 781 F.2d 826, 833–834 (10th Cir.1986) (conviction reversed where court failed to appoint defendant a psychiatrist to aid in the defense). There is what may be called a right of "foundational fairness" requiring financial support for assigned counsel in preparing a defense just as there is the requirement of fundamental fairness limiting the manner of the prosecution of criminal charges in federal courts.

Because of the uncertainties involved, these authorizations and interim payments are reviewed periodically during the pendency of a case. Authorizations and awards during the progress of the case are not final judgments. *See United States v. Davis,* 953 F.2d 1482, 1498 n. 21 (10th Cir. 1992) ("Fee determinations by the district judge pursuant to the Criminal Justice Act are administrative in character and do not constitute final appealable orders within the meaning of 28 U.S.C. § 1291.").

Papers filed with the court, records of court activity, exhibits received at hearings and trials and orders and judgments entered by the court are all records normally accessible by the press and public. The Supreme Court included such records within the general common law right to inspect and copy public records and documents in *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597, 98 S.Ct. 1306, 1311–12, 55 L.Ed.2d 570 (1978). The Court also held that this common law right was subject to the supervisory power of each court to limit access to

protect other interests and said that the decision as to access is "one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." *Id.* at 599, 98 S.Ct. at 1312–13. In its holding the Supreme Court affirmed a district court order denying the copying of tapes received in evidence.

■ The Freedom of Information Act applies to executive branch agencies, not the courts. The Supreme Court has commented on the contours of the public's right of access to judicial records in several cases. In *Press–Enterprise II,* the Supreme Court reversed a decision denying public release of the transcript of a closed preliminary hearing in a California murder case because the state court denied the existence of any First Amendment right of access and found justification for the secrecy by a showing of "a reasonable likelihood of substantial prejudice" to the defendant's right to a fair trial. *Press–Enterprise II,* 478 U.S. at 6–7, 106 S.Ct. at 2739–40. Writing for the majority, and citing *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), Chief Justice Burger observed that opening the process to neutral observers was an important means of assuring fairness. *Press–Enterprise II,* 478 U.S. at 7, 106 S.Ct. at 2739–40. In *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), the Court agreed with the defendant that the Sixth Amendment and the historical tradition of accessibility recited in *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), required that a hearing on a motion to suppress evidence be open. In *Press–Enterprise II,* Chief Justice Burger then quoted the language from *Press–Enterprise I* that openness in criminal trials "enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Press–Enterprise II,* 478 U.S. at 9, 106 S.Ct. at 2740 (quoting *Press–Enterprise I,* 464 U.S. at 501, 104 S.Ct. at 819). The Chief Justice referred to the importance of secrecy in grand jury proceedings and articulated an "experience and logic" test in the following paragraph:

These considerations of experience and logic are, of course, related, for history and experience shape the functioning of governmental processes. If the particular proceeding in question passes these tests of experience and logic, a qualified First Amendment right of public access attaches. But even when a right of access attaches, it is not absolute. *Globe Newspaper Co. v. Superior Court, supra,* [457 U.S.] at 606 [102 S.Ct. at 2618]. While open criminal proceedings give assurances of fairness to both the public and the accused, there are some limited circumstances in which the right of the accused to a fair trial might be undermined by publicity. In such cases, the trial court must determine whether the situation is such that the rights of the accused override the qualified First Amendment right of access. In *Press–Enterprise I* we stated:

> [T]he presumption may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

478 U.S. at 9–10, 106 S.Ct. at 2740–41 (citation omitted).

■ The reach of the ruling in *Press–Enterprise II* can be measured by careful consideration of the dissenting opinion of Justice Stevens, joined by Justice Rehnquist. Justice Stevens observed that the First Amendment right involved was not the right to communicate information but the right to acquire it. 478 U.S. at 18, 106 S.Ct. at 2745 (Stevens, J., dissenting). A prior restraint on publication by the press can be valid only upon proof of a compelling governmental interest with any restriction narrowly tailored to serve that interest. *Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 556–570, 96 S.Ct. 2791, 2801–08, 49 L.Ed.2d 683 (1976). The First Amendment right of public access to court proceedings is *qualified* and may be overridden when closure is essential to preserve higher values and is narrowly tailored to serve that interest. Restrictions on the

right of access are not limited to protections of the defendant from prejudicial pre-trial publicity. As noted in footnote 2 of the Court's opinion in *Press–Enterprise II,* the interests of persons other than the accused may require protection as, for example, the protection of victims of sex crimes in *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 607–610, 102 S.Ct. 2613, 2620–22, 73 L.Ed.2d 248 (1982). *Press–Enterprise II,* 478 U.S. at 9 n. 2, 106 S.Ct. at 2741 n. 2.

The movants have cited several cases from circuit courts of appeals with the suggestion that in every case of sealing or closure (1) the proponent must establish a "compelling" competing interest that outweighs the First Amendment right of access; (2) the limited access must be both necessary and effective in protecting that interest and (3) the limitation adopted must be the least restrictive means available.

 That suggested method of analysis is both an overstatement of the qualified right of access and an oversimplification of the manner of its application. As previously observed, the interests to be protected are not limited to the protections of the right of the accused to a fair trial. The timing of the disclosure is also a significant factor in the balancing of the affected interest. The stage of the proceeding may determine the question of access.

Some appellate courts have sought to distinguish the common law principle of openness from the qualified First Amendment right of access. For purposes of this opinion, they are conflated and the standards to be applied are those articulated in *Press–Enterprise II.*

 The media motions to open sealed documents will be determined by the answers to these questions: Does the matter involve activity within the tradition of free public access to information concerning criminal prosecutions? Will public access play a significant positive role in the activity and in the functioning of the process? Is there a *substantial probability* that some recognized interest of higher value than public access to information will be prejudiced or affected adversely by the disclosure? Does the need

for protection of that interest override the qualified First Amendment right of access? Is the closure by the court essential to protect that interest, considering all reasonable alternatives? This same analysis will also be used in considering any future motions to seal.

 The present focus of attention is on documents generated in activities not directly related to the process of adjudication. Accordingly, they are not within the strong presumption of open access to proceedings in court. Historically, some types of court documents have been kept secret for important policy reasons. They include presentence reports. *United States v. Corbitt,* 879 F.2d 224 (7th Cir.1989), *cited with approval in Matter of Search of 1638 E. 2nd St., Tulsa, Okl.,* 993 F.2d 773, 775 (10th Cir.1993). *See also Times Mirror Co. v. United States,* 873 F.2d 1210, 1219 (9th Cir.1989) (search warrants and supporting affidavits).

The majority of the documents under seal in the clerk's office are applications and orders for payment of interim fees and support services for defense attorneys under 21 U.S.C. § 848q(9) and (10). The court has provided funding for an extensive factual investigation, including extensive travel for interviews of persons who may have relevant information. Authority to retain experts for consultation in a wide ranging variety of disciplines has been granted. The defendants' lawyers have vigorously pursued their duty to investigate. Some sense of the magnitude of the task involved in the defense investigation is provided by the statement of government counsel, in discussing a discovery schedule, that there are more than 10,000 FBI interview reports available for inspection by the defense.

Media counsel have shown their sensitivity to the secrecy required for the defense investigation and trial preparation by restricting their requests to the amounts paid out to the attorneys and others providing services to the defense. There is no tradition of public access to that information while the investigation and preparation for trial are in progress. To the contrary, the requests must be submitted *ex parte* and *in camera* to keep privileged information from the prosecution.

Disclosures to the public would, of course, become known to government counsel. In *United States v. Suarez*, 880 F.2d 626 (2nd Cir.1989), the Second Circuit Court of Appeals affirmed an order of a district court releasing to the news media the amounts of CJA payments. There, the request was made after jury selection and while the trial was in progress. The case was a felony prosecution not involving the death penalty. The same policy considerations were not present at that stage of the proceedings and the case did not have the heightened sensitivity of this case.

■ There is no doubt that the cost of the legal defense paid for from public funds for each of the defendants in this case will become public information at some time. The question is when. Media counsel argue that the public is interested in the amount spent for the defense during the course of the case because the funds are public and the taxpayers may question both the reasonableness and the appropriateness of the expenditures. The legitimacy of those interests is unquestioned. Yet, there are important interests to be protected before the entry of final judgments in this case.

The movants concede that disclosing the services performed and the reason for them would inappropriately reveal the defendants' investigations and strategies. All of the reasons supporting grand jury secrecy are equally applicable to the pre-trial preparation of the defense of capital charges. This includes the protection of people from public speculation about their possible involvement in the criminal conduct at issue. That is particularly important in this case given the horrendous destruction of life and property from the bombing of a building housing government agencies, the widespread publicity and the prolixity of punditry about the identity and motivation of possible perpetrators.

An additional interest is the protection of appointed counsel from vilification and accusations of improper motivations in the conduct of their responsibilities in the representation of these defendants. Because of the inhibitions imposed upon them by their professional responsibilities, these lawyers are unable to respond to such accusations or to make public explanations of their conduct. Moreover, any "robust debate" about expenditures for the defense of the accused at this stage would be counter-productive to the process of adjudication by diverting counsel from proceeding with the task of preparing for trial. The interests adversely affected by disclosure now are the effectiveness of defense counsel and fairness of the trial process.

■ Revealing only the amounts of interim payments is not a reasonable alternative to full disclosure. It would distort the public perception about the fairness of the process because the expenditures, out of context, would emphasize costs without any information about benefits obtained. Public access to these cost figures would be detrimental, not helpful, to the functioning of the court at this stage of the proceeding.

Accordingly, this court finds and concludes that the request for the amounts of expenditures made for defense services before trial must be denied for the protection of the interests identified in this opinion. All documents submitted in connection with approval for and payment of services under 21 U.S.C. § 848(q) shall be marked "§ 848(q) documents" with the name of the defendant involved and shall remain sealed until the entry of final judgments concluding these proceedings as to both defendants in the trial court. Future filings of documents of this type will be so marked and sealed.

■ Another category of sealed documents involves the issuance of subpoenas for production of documents under Fed. R.Crim.P. 17(c). Ordinarily subpoenas for court hearings are issued in blank by the clerk of the court at the request of counsel. Fed.R.Crim P. 17(a). There is no file record made of this process. When requested by counsel for an indigent defendant, the court will order the issuance of the subpoena upon an *ex parte* application "upon a satisfactory showing that the presence of the witness is necessary to an adequate defense." Fed. R.Crim P. 17(b). These applications and orders are routinely sealed to protect them from disclosure to the government before trial.

Rule 17(c) of the Federal Rules of Criminal Procedure provides for production of books, papers, documents or other objects designated in a subpoena, before the court prior to trial or prior to the time they are offered in evidence. The court may authorize inspection by the parties and their attorneys upon their production. Orders for such production before trial depend upon a showing that the items to be produced are: (1) evidentiary and relevant; (2) not otherwise procurable before trial by the exercise of due diligence; and (3) so necessary for trial preparation that the failure to obtain such inspection may tend to delay the trial unreasonably. The application must be made in good faith and not merely for discovery. *United States v. Nixon*, 418 U.S. 683, 699–700, 94 S.Ct. 3090, 3103–04, 41 L.Ed.2d 1039 (1974).

A sampling of the sealed papers in this category shows that they have been routinely sealed without due regard for any particular need for secrecy. Thus an order was entered under seal on July 31, 1995, directing service of a Rule 17(c) subpoena "together with a copy of the Motion" to identify the items to be returned to the clerk by mail. Disclosure of the motion to the person or entity being served appears to be inconsistent with any legitimate need for secrecy. There are other orders for subpoenas for production of information which do not appear to involve any need for secrecy between the parties. Indeed, counsel have agreed upon disclosure of the orders to each other under some circumstances. Presumably there is no need to deny public access to the orders for production. The material produced, however, will be kept from public view under the guidance given in *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984).

No categorical order can be entered on the status of these Rule 17(c) applications and orders. If any party wants to continue to keep the applications and orders secret, they must file a motion setting forth the reasons under the analysis articulated above.

The government in response to the media motions identified papers filed in magistrate judge proceedings concerning material witnesses. These are numbers M–95–94–H, M–95–102–H and M–95–103–H. These documents have been and will continue to be sealed because they are within the tradition of secrecy and there is no reasonable alternative to denial of any public disclosure of them at this time.

Documents numbered 127, 130, 131, 132 and 133 concern motions and orders relating to the conditions of confinement of one of the defendants at FCI, El Reno, and entry 143 is a sealed transcript of an *in camera* hearing held by Chief Judge David Russell. For the reasons stated in the order setting the *in camera* hearing and on the record at the conclusion of the hearing, Judge Russell sealed the transcript of the hearing and pertinent documents. It is sufficient to say that those reasons meet the criteria for secrecy established in this opinion. The principal justification for sealing is the necessity to protect confidence in an attorney-client relationship.

There may be records sealed to protect the privacy interests of the defendants in custody, such as matters relating to physical or mental health. They should be identified by the phrase "privacy rights of the defendant in custody." Upon such identification they will remain sealed unless there is a challenge to such classification and in that event further inquiry may be necessary.

There is a misperception about the existence of a "non-public docket." The clerk's office prepares all docket entries pursuant to a computer program called the Integrated Case Management System (ICMS). Any corrections or changes in docket entries are made through a "utility program" which is referred to as the "non-public" docket. All documents in the custody of the clerk have an ICMS number in the public docket. There is no dual-docketing or "two-tiered" system of docketing as prohibited in *United States v. Valenti*, 987 F.2d 708, 715 (11th Cir.1993).

Entries Nos. 362, 368 and 371 are proposed questionnaires for possible use in selection of jurors. There is no dispute that the documents will remain sealed. Indeed,

they are clearly premature and probably moot since the reassignment of this case.

Some documents have been unsealed by orders entered by Magistrate Judge Howland by agreement of the parties.

There has been no *in camera* review by me of the documents now under seal and I do not expect to undertake such a task. The lawyers for the parties in this case will now be responsible for review of the past practices to determine what further action need be taken to identify the categories of papers under seal and proceed under the presumptions established in this opinion.

Upon the foregoing, it is now ORDERED as follows:

1. All applications and orders for payment of interim fees and support services for defense attorneys under 21 U.S.C. § 848(q)(9) and (10) shall remain sealed until the entry of final judgments as to both defendants. On all future filings in this category, the clerk shall record with the number of each entry the type of application, for example, "§ 848(q) application for interim fees for counsel," "application for travel," etc. and the name of the defendant on whose behalf the application has been submitted. Entries of orders shall refer back to the ICMS number of the application. If any *ex parte, in camera* hearing is necessary to evaluate an application under § 848(q), a tape recording or transcript of that hearing will be kept under seal in a separate file. The docket entry for the application will include a reference to the date of such a hearing and the persons present.

2. No other documents will be sealed automatically. All applications and orders for production of documents and other things pursuant to Fed.R.Crim.P. 17(c) now on file will be opened for public inspection on Monday, March 4, 1996, unless any party to this criminal proceeding files before that date a motion to seal particular documents or parts thereof for reasons believed to be adequate within the standards established in this opinion. Any objections to such motions must be filed on or before March 11, 1996.

3. Any party seeking an order of secrecy for any documents other than those identi-fied in paragraphs 1 and 2 above, must submit a motion for entry of a sealing order consistent with the analysis articulated in this opinion. The motions will be placed in the case file and will be open to public inspection. The proposed filing will be submitted under seal until the motion to seal is ruled upon. No sealing order will enter for at least three business days after the filing of the motion to seal, except in emergency circumstances shown or referred to in the motion. Any objections filed within those three business days will be considered by the court.

4. On the day following the filing of a motion to close all or any part of an adversary hearing or court proceeding, a notice will be displayed in the clerk's office advising of such motion and informing that any person or entity may file objections to the motion on or before the date set forth in such public notice, which date will be not less than three business days from the date of posting the notice. The motion and any objections will be heard in open court.